**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg (**bgreenberg@litedepalma.com**)
Jason E. Macias (**jmacias@litedepalma.com**)
Two Gateway Center, Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
Fax: (973) 623-0858

Attorneys for Plaintiff
{Additional counsel on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT F NEW JERSEY

*DOCUMENT ELECTRONICALLY FILED*

| | |
|---|---|
| Ronald Robert Warne, on behalf of himself ) and others similarly situated, ) )                 Plaintiff, ) ) vs. ) ) Cellco Partnership, d/b/a/ Verizon ) Wireless, ) )              Defendant. ) | Civil Action No. **CLASS-ACTION COMPLAINT** **JURY DEMAND** |

## INTRODUCTION

Ronald Robert Warne, residing at 2153 S. Santa Fe Street, Vista, California 92083 on behalf of himself and others similarly situated, brings this action to obtain damages from and injunctive relief against Verizon for charging him and class members for data service of less than .50 megabytes[1] ("MB") since, according to Verizon's records, megabyte usage of less than .50 MB results in no perceivable customer benefit. This Complaint is based on personal knowledge as to plaintiff himself and his own actions and on information and belief, as well as on plaintiff's counsel's extensive investigation of the facts and law, including a review of publicly available

---

[1] 1,024 kilobytes = 1 megabyte.

information, interviews conducted by plaintiff's counsel, and other investigation.  All of that investigation occurred before Verizon announced on Monday, October 4, 2010 that it would refund monies to certain customers for certain actions covered by this Complaint

## PARTIES

1.      Plaintiff, Ronald Robert Warne, is a California citizen.  During the class period, Defendant charged Plaintiff and Plaintiff paid Defendant for multiple incidents of data service of less than .50 MB.

2.      Defendant, Cellco Partnership, d/b/a Verizon Wireless ("Verizon"), is a Delaware general partnership with its principal place of business located at 1 Verizon Way, Basking Ridge, NJ 07920.

## JURISDICTION AND VENUE

3.      This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, which amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class of Plaintiff is a citizen of a State different from any defendant" and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs."  This Court also has jurisdiction under 28 U.S.C. § 1331 because Count I arises under federal law.

4.      This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of the Court, and Verizon is headquartered in this District.

5.      Venue exists in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Verizon transacts business in, is found within, and has agents in this District.

## FACTUAL ALLEGATIONS

*Wireless phones and mandatory data-service charges*

6.      Two types of wireless telephones exist:  Smartphones and non-smartphones.

7.      Smartphones (like the Blackberry, iPhone, Droid, and Palm Pre) offer advanced capabilities, often with PC-like functionality, and provide users features like e-mail, full Internet-browsing access, and sometimes built-in full keyboards or external USB keyboards.

8.      Non-smartphones (like the LG Chocolate Touch, LG enV3, LG enV Touch, LG VX8360, Motorola Entice, Motorola Rival, Samsung Rogue, Samsung Alias2, and Nokia Twist) have HTML browsers but only marginally support data services, offering limited-content Internet browsing and virtually no e-mail capabilities.  Non-smartphones are used primarily for placing and receiving phone calls and not for conducting activities requiring significant megabytes of data service.

9.      In addition to the price that wireless customers pay for monthly calling plans, Verizon customers must purchase a "data plan" that provides different amounts of web-browsing capabilities depending on the data plan's price.  For instance, in addition to the price of Verizon smartphone customers' monthly calling plans, smartphone customers must also purchase Verizon's $29.99/month data plan for unlimited web browsing.  In addition to the price of Verizon non-smartphone customers' monthly calling plans, non-smartphone customers must also purchase Verizon's $9.99/month data plan for 25 MB of web browsing.

*Verizon's phantom data-service charges*

10.     On November 1, 2007, Verizon converted its available calling plan from

"America's Choice" calling-and-data plan to "Nationwide" calling-and-data plan.

11.     Under America's Choice, Verizon billed customers' calls and data usage by the minute during weekdays, while allowing customers to enjoy free unlimited voice and data usage on nights and weekends.  As such, under America's Choice, Verizon was unable to charge customers for significant data usage incurred during nights and weekends.  So, for example, if a customer purchased a 500-minute/month America's Choice calling-and-data plan, he or she could use unlimited voice and data service on weeknights (after 9:00 p.m) and weekends without affecting his/her 500-minute cap.

12.     But under Verizon's Nationwide plan, Verizon began charging non-smartphone customers by the MB, meaning that non-smartphone customers' voice and data usage were no longer tied to the amount of minutes their plan allotted per month.  Further, non-smartphone customers under the Nationwide plan could no longer enjoy unlimited data usage on week nights after 9:00 p.m. or on weekends.  Verizon's Nationwide Plan charged non-smartphone customers $1.99 per MB used unless they paid for a data plan, which was a charge in addition to their monthly calling plan.

13.     A primary reason, if not the sole reason, for Verizon's conversion from America's Choice to Nationwide billing was to prevent customers from enjoying the benefits of unlimited data usage on nights and weekends.  Verizon said nothing to customers concerning its billing conversion from minutes to MBs and instead sought to make its Nationwide billing plan more attractive to customers by offering them discounts on new wireless handsets.

14.     Verizon's conversion from previously billing data usage by the minute to MB billing did not come without significant snares.  Primarily, customers whose phones would accidentally or inadvertently open to the landing page on their mobile web browser (either "Get

it Now" or "My Verizon") would incur a $1.99 charge. However, accidentally launching the mobile web browser never resulted in a charge under the America's Choice plan because such an incident would merely result in the loss of a minute. Each accidental launch usually expended less than .50 MB of data.

15.    Immediately following Verizon's switch to the Nationwide plan, Verizon knew its non-smartphone customers were suddenly being charged $1.99 per MB for unrequested data.

16.    Accidental internet launches occurred when non-smartphone customers accidentally hit their handset's "up" navigational key, which was a one-push connection to the their mobile web browser's landing page (either "Get It Now" or "My Verizon"). But even if these customers immediately exited their web browser, thus incurring data usage of less than 1 MB (again, .50 KB or less), Verizon rounded this data usage up to 1 MB and immediately charged them $1.99 (since non-smartphone customers typically don't have data plans against which to charge intentional or unintentional data usage). Further, accidentally launching a customer's "Dashboard" portal, which resembles a mobile web browser landing page except that the Dashboard loads "Channels," can access up to 2-5 MB of data. Verizon would charge customers between $3.98 and $9.95 for this accidental launch.

17.    In addition to Verizon charging non-smartphone customers for accidental launches, both smartphone and non-smartphone customers were charged for unsolicited data flooding. For example, devices such as Blackberries were left open to unsolicited data directly after a customer would send a multimedia message ("MMS") such as a picture or video message. Customers would then get charged .02 cents per kilobyte ("KB") for this unsolicited data.[2]

18.    Verizon was not prepared to deal with the billing issues that resulted from these

_____

[2] Verizon charged non-smartphones by the MB but charged smartphones such as Blackberries by the KB.

accidental launch or unsolicited data charges.  In fact, Verizon failed to issue an official

communication or train its Business Evolution and Systems Technology Department (referred to

as the BEST Team), IT, Revenue Assurance, or Vision Correction departments on how to deal

with these new charges.

19.     In fact, Verizon's management failed to train its billing team or customer-service

representatives on how to deal with non-smartphone customers' complaints as to the charges (in

varying amount) resulting from these accidental launches or provide guidance on when to offer

customers' credits.  Instead, Verizon ignored and in turn tacitly encouraged customer service

representatives to creatively explain these accidental launch charges.  Examples of creative

explanations were attributing customer's accidental data use to "pocket dialing," children's

interference, or "billing lag." "Billing lag" attributed billing for data usage to accessing various

towers outside a customer's home-calling area that resulted in charges on the customer's next

month's bill.

20.     Per rule described on Verizon's intranet site, "Infomanager," Verizon customer

service representatives would place a data block on a customer's account upon request.  Data

blocks would prevent a customer from accessing the internet.

21.     However, Verizon discouraged its customer-service representatives from offering

data blocks in the first instance and from offering data blocks beyond those suggested or

requested by the customer.  Regardless, data blocks were ineffective in preventing unsolicited

data flooding a customer's handset.

22.     If or when a customer requested a credit with respect to charges resulting from an

accidental launch or unsolicited data, Verizon's credit policy ("OCC" – Other Charges &

Credits) proscribed customer-service representatives from awarding any more than 50% of a

customer's disputed amount.  The award of less than 50% of the disputed amount in turn creates the customer perception that the customer had succeeded in his or her billing issue.

23.     Further, customers with data blocks on their handsets, often times children and teenagers, who attempted to search the internet and launch their mobile web browser's landing page were still charged $1.99 for a rounded-up MB of data.  Verizon would charge for the minuscule amount of data (less than .50 MB) used to generate an error message stating that data was blocked on that customer's phone.

24.     When customers called Verizon to complain about useless data charges, Verizon's customer-service representatives possessed the ability to identify, via Verizon's Mobile Telephone Switchboard Office ("MTSO"), the IP address that a customer visited to trigger the alleged data charge.  The customer-service representatives could then enter the IP address received from the MTSO into an online directory to obtain the identity of the alleged website.  The website often visited by customers complaining of these accidental launches was Verizon's own landing page.

25.     In certain circumstances, no IP address corresponded to a customer's alleged data usage because customers were charged $1.99 even when their handset generated 0.00 MB of data.  Nevertheless, Verizon charged the customer $1.99 for 1 MB of data service.  Even handsets without data capabilities (like analog phones and Amigos for children) incurred data charges for 0.00 MB readings.

26.     Although Verizon's customer-service representatives offered a range of ultimately unhelpful excuses and refunds, when this problem made its way to the Verizon's Legal Department in May 2008, Verizon's customer-service representatives were formally forbidden from discussing this issue with customers.  Instead, customer service representatives simply said

7

that Verizon's Legal Department was now addressing it.

27.    On December 4, 2009, the FCC wrote to Verizon requesting, among other things,

information about Verizon's phantom data-service charges:

> *Mobile Web Charge*
>
> In light of a recent *New York Times* article suggesting that customers may be
> charged $1.99 for inadvertently accessing Verizon Wireless's Mobile Web, we
> would like to better understand the terms and conditions of such access.
>
> 8.    When does Verizon Wireless charge usage fees for access to
> Verizon Mobile Web?  In particular, is there a minimum data
> amount or level of access that triggers charges, and if so, what is
> that amount or level?  Which phones sold by Verizon have
> individual keys pre-programmed to provide for one-press access to
> various Mobile Web services?  Is it correct that customers are
> charged for minimal, accidental usage by customers using these
> phones?
>
> 9.    Can a customer re-program keys that provide for one-press access
> to various Mobile Web services to disable that function?  If so,
> how can a customer do so, and how does Verizon inform
> consumers how to re-program these keys?  If not, how does
> Verizon inform consumers that these keys cannot be
> reprogrammed, and that consumers may be charged for pressing
> them accidentally?  The recent article also suggested that, even if a
> consumer asks to have the Mobile Web feature turned off, charges
> are incurred for transmission of a blocking notification.  Is this
> correct?  If so, are consumers informed that they may incur charges
> even after turning off the feature?

28.    Verizon's December 18, 2009 response denied some of the FCC's concerns and

ignored others, instead merely describing the various technical aspects of data charges and

configurations of wireless phones:

> **Response [to 8]:**  Usage fees for Verizon Wireless' mobile Internet
> service, Mobile Web, apply when a customer launches the Internet
> browser and then navigates away from the default Mobile Web homepage
> to sites other than a Verizon Wireless customer care site (*e.g.*, My
> Verizon, the online customer account portal).  Usage fees are not charged

when a customer simply launches the Internet browser and lands on the Verizon Wireless Mobile Web homepage, which is the default setting.

Usage is measured by increments of megabytes and is charged based on the data plan to which the customer subscribes. Customers who do not subscribe to prepaid or unlimited transport bundles are charged $1.99 for each megabyte, or fraction thereof, of data usage per month. Most devices sold today have a default setting so that when the Internet browser is activated it will immediately link to the Mobile Web homepage (which, as indicated above, would not cause a customer to incur a fee). Where available, this link is usually on the main menu of the device for convenience since it is a commonly used application, or is accessed by pressing a "fourway" navigation key on the device. The location of the browser link has varied over the past ten years and on hundreds of Mobile Web capable devices, and is not always configurable from the main menu.

As noted above, in order to protect customers from minimal, accidental usage charges, Verizon Wireless does not charge users when the browser is launched, and opens to the Verizon Wireless Mobile Web homepage. If the browsing session ends there without the customer navigating to another webpage, the customer will not incur charges for Mobile Web browsing.

Verizon Wireless strives to ensure that customers are not billed for minimal accidental data usage charges. If a customer believes that he has been charged for such minimal accidental usage, he should call Customer Care, explain the circumstances, and request a credit. Customer Care representatives are authorized to credit the account, and also to explain to the customer how to avoid recurrence of accidental usage charges.

**Response [to 9]:** Certain devices can be re-programmed to remove (or add) the browser link from the main menu or change the destination for the "four-way" navigation key, but this option is not available on all Mobile Web capable devices.

However, most devices include a feature that permits customers to lock their screens to avoid accidental dialing or application launches. Use of this feature would prevent the browser link from being triggered. Each mobile device comes with a user's manual that identifies the Screen/Phone lock feature in the index, and provides instructions on how to implement it. Also, Verizon Wireless has a technical support phone number and technicians available in each of its stores to assist customers in using this feature at no charge. If the device permits reprogramming by the user, the user's manual would describe the procedure.

> Verizon Wireless also offers customers the ability to apply data access blocks to their account for either all data access or specifically to Mobile Web. A data block can be applied through Customer Care and at point of sale. In addition, Mobile Web block can be applied on-line at the My Verizon website.
>
> Verizon Wireless does not charge for Mobile Web blocking notifications. If the referenced article suggested that there is a charge, it was inaccurate.

29.     Although Verizon accurately explained in its letter response that it did not charge customers for accidentally landing on their mobile web browser's landing page, Verizon's carefully worded response did not reveal that it only made this billing change in August 2008 and that before that date Verizon *had* charged customers for accessing their mobile web browser's landing page.

30.     Further, while Verizon claimed that it was technically able to make this landing-page billing adjustment, Verizon has never instituted a similar adjustment for alleged phantom data usage of 0.00 MB or for data usage of less than .50 MB (whether accessed accidentally or intentionally) which usage had no objective or technological consumer benefit.

31.     In addition to the foregoing, when customers insisted on receiving data blocks to presumably end the influx of unwanted data, these data blocks impaired customers' ability to send and receive picture messages. Unlike short messaging service ("SMS"), commonly referred to as text messaging, multimedia messaging service ("MMS"), which allows a user to send picture or video messages, requires a certain amount of data to send each message. Therefore, customers who purchase an unlimited picture and text package but for whom Verizon has placed a data block on their account can no longer enjoy the benefit of their bargain. Specifically, the data block prevents this customer from sending or receiving picture of video messages that require data usage.

32.     In her August 24, 2009 *Money Matters* column, *The Cleveland Plain Dealer's*

Teresa Murray described some of these phantom-data-charge situations:

> At a minimum, thousands of customers apparently have been charged
> $1.99 per month for Internet "data usage" even though they had not tried
> to go online.  In some cases, customers were charged when their phones
> were off, the batteries were dead, the phone's Internet access was blocked
> or even when the phones didn't have the software to go online.

33.     In this same article, Ms. Murray recounted her conversation with Verizon's region

president, Robert Tang, who acknowledged these problems and admitted that Verizon

"believe[s] they're nationwide."

34.     In his November 12, 2009 column, *The New York Times'* David Pogue also

reported on this issue, relating a Verizon insider's story of how Verizon is conducting its

phantom-data-charge scheme:

> The phone is designed in such a way that you can almost never avoid
> getting $1.99 charge on the bill.  Around the OK button on a typical flip
> phone are the up, down, left, right arrows.  If you open the flip and
> accidentally press the up arrow key, you see that the phone starts to
> connect to the web.  So you hit END right away.  Well, too late.  You will
> be charged $1.99 for that 0.02 kilobytes of data.  NOT COOL.  I've had
> phones for years, and I sometimes do that mistake to this day, as I'm sure
> you have. . . .
>
> Every month, the 87 million customers will accidentally hit that key a few
> times a month!  That's over $300 million per month in data revenue off a
> simple mistake!
>
> Our marketing, billing, and technical departments are all aware of this.
> But they have failed to do anything about it—and why?  Because if you
> get 87 million customers to pay $1.99, why stop this revenue?  Customer
> Service might credit you if you call and complain, but this practice is just
> not right.
>
> Now, you can ask to have this feature blocked.  But even then, if you one
> of those buttons by accident, your phone transmits data; you get a message
> that you cannot use the service because it's blocked–BUT you just used
> 0.06 kilobytes of data to get that message, so you are now charged $1.99
> again!

> They have started training us reps that too many data blocks are being put
> on accounts now; they're actually making us take classes called
> Alternatives to Data Blocks.  They do not want all the blocks, because
> 40% of Verizon's revenue now comes from data use.  I just know there are
> millions of people out there that don't even notice this $1.99 on the bill.

35.     In Mr. Pogue's December 21, 2009 column, he recognized the "outrageous[ness]"

of Verizon's response [b]ecause basically it denies everything.  It says, in essence, . . . 'We don't

charge those $2 accidental-Internet fees.  You must be mistaken."  But the "nationwide" nature

of this problem, as admitted by Mr. Tang and observed by Ms. Murray's many readers, confirms

otherwise.

36.     Claiming it could not cure the epidemic of unrequested data streaming onto

customers handsets (even though, for instance, Verizon had already decided to stop charging

customers for accidental launches to their mobile web landing page), on or about January 16,

2010, Verizon decided—as its final curative effort—to *pre*-charge non-smartphone customers for

this useless data by imposing a mandatory $9.99/month charge on all new non-smartphone

contracts, so its new non-smartphone customers would bear the burden (by way of prepayment)

of Verizon's inability to stop unrequested data from streaming onto these customers' phones.

37.     Verizon described its 9.99/month program as a "benefit" to new non-smartphone

customers in that they now had the benefit of 25 MB of pre-paid data usage even though non-

smartphone customers don't need data plans, for if they used data and, accordingly, needed a

data plan smartphones were available for such purpose.

38.     Further smartphone customers were not immune from underwriting Verizon's

scheme.  For these customers, Verizon imposed a $29.99/month *pre*-charge for unlimited data

access—insisting that most customers would want this plan—yet, again, never confessing that

this plan, too, was designed for smartphone customers to prepay for Verizon's inability to stem

unwanted data and refusal to credit smartphone customers for data usage under .50 MB.

*Plaintiff's phantom data-service experience and charges*

39.     Plaintiff has a current Verizon contract that includes a wireless telephone line.

40.     Plaintiff's calling plan as set forth in his Verizon contract does not include a data-

service package for this line.

41.     Despite Plaintiff never being directed beyond his default Verizon mobile web

browser, which Plaintiff can confirm through Verizon's records, Verizon charged Plaintiff's line

for less than .50 MB of data service.

42.     After Plaintiff noticed various data charges, he requested that Verizon stop

charging him, but Verizon's data charges continued.  Plaintiff paid Verizon for this unaccessed

data service.

43.     Plaintiff had Verizon place a data block on his account.

44.     As a current Verizon non-smartphone customer, Plaintiff is also at imminent risk

of irreparable harm by Verizon imposing on him a $9.99/month data-service charge in the event

he replaces his wireless handset.

## CLASS-ACTION ALLEGATIONS

45.     Plaintiff brings this lawsuit on behalf of the following class under Rule 23(b)(3)

of the Federal Rules of Civil Procedure:

> All Verizon current or former customers in California without data
> plans whom, from November 1, 2007 – present, Verizon charged
> for data service under .50 MB.

> Excluded from Plaintiff's class are (a) Verizon and any entity in
> which Verizon has a controlling interest; (b) Verizon's employees,

officers, directors, agents, and representatives and their family
members; (c) class counsel, employees of class counsels' firms,
and class counsels' immediate family members; and (d) the
presiding judge and/or magistrate judge and any of their immediate
family members.

46.     Verizon charged Plaintiff for data service of less than .50 KB.  Therefore, Plaintiff

is a class member.

47.     Plaintiff can identify all other class members from Verizon's records.

48.     Plaintiff does not know the exact size of the class since this information is in

Verizon's exclusive control.  But based on the nature of the trade and commerce involved,

Plaintiff believes that the class numbers in the millions and that the respective class members are

dispersed throughout California.  Therefore, joinder of all class members, respectively, would be

impracticable, and class treatment is the superior method for fairly and efficiently adjudicating

this controversy.

49.     Plaintiff's claims are typical of other class members' claims because Plaintiff and

class members were all injured through Verizon's uniform misconduct and paid for data service

for which they received no objective or technological benefit.

50.     Common legal and factual questions predominately exist within the class,

including but not limited to the following:

a.      Whether Verizon had contracts with Plaintiff and the class members to
provide wireless service for a monthly sum;

b.      Whether Plaintiff's and the class members' contracts provided for data
service;

c.      Whether Plaintiff's and the class members' contracts allow Verizon
charges for data service that provided no objective or technological
consumer benefit, such as when less than .50 KB;

d.      Where these contracts do not provide for data service, whether Verizon
violated the Federal Communications Act, 47 U.S.C. § 201 *et seq.*, by

charging for data service for which Plaintiff and the class members never contracted;

e.  Where these contracts do not provide for data service, whether Verizon charged Plaintiff and the class members for data service when, according to Verizon's records, Plaintiff and the class members received data service of less than .50 KB, which data service had no objective or technological consumer benefit;

f.  Whether Verizon breached Plaintiff's and the class members' contracts by charging for data service for which Plaintiff and the class members never contracted and/or had no objective or technological consumer benefit;

g.  Whether Verizon was unjustly enriched by charging Plaintiff and the class members for data service when, according to Verizon's records, Plaintiff and the class members never accessed the Internet nor received data service having any objective or technological consumer benefit;

h.  Whether Verizon's conduct proximately caused injury to Plaintiff and the class members, and if so, the appropriate classwide measure of class members' damages or equitable relief;

51.  Plaintiff can and will fairly and adequately represent and protect the class members' interests and has no interests that conflict with or are antagonistic to these class members' interests.  Moreover, Plaintiff's attorneys are experienced and competent in complex, class-action litigation.

52.  Class certification is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because:

a.  Common questions of law and fact overwhelmingly predominate over any individual questions that exist within the class and, consequently, enormous economies to the Court and parties exist in litigating the common issues on a class-wide basis instead of on a repetitive individual basis;

b.  Each class member's damage, equitable, and injunctive claim is too small to make individual litigation an economically viable alternative, and few, if any, class members have any interest in individually controlling the prosecution of separate actions;

c.    Class treatment is required for optimal deterrence and compensation and for limiting the Court-awarded, reasonable legal expenses incurred by class members; and

d.    Despite the relatively small size of each class member's claim, the aggregate volume of their claims, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable class counsel to litigate this case as a class action on a cost-effective basis, especially when compared with repetitive individual litigation, and no unusual difficulties are likely to be encountered in this class action's management in that all legal and factual questions are common to the class.

## COUNT I
### Violation of Federal Communications Act, 47 U.S.C. § 201 *et seq.*

53.    Unjust or unreasonable billing practices constitute a violation of 47 U.S.C. § 201 *et seq.*, which states in relevant part:

> All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful . . . .

54.    Verizon's practice of charging Plaintiff and the class members for data usage under .50 KB, which has no objective or technological benefit to the consumer, was unjust and unreasonable and violated 47 U.S.C. § 201 *et seq.*

55.    Under 47 U.S.C. § 206, anyone harmed by a carrier's violation of 47 U.S.C. § 201(b) can bring a claim for damages:

> In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this Act prohibited or declared to be unlawful . . . such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provision of this Act, together with a reasonable counsel or attorney's fee . . . .

56.    Under 47 U.S.C. § 206, Plaintiff and the class members are entitled to damages and attorneys' fees.

## COUNT II
### Breach of Contract Under California Law

57.     Plaintiff repeats the allegation of the preceding paragraphs as if set forth at length herein.

58.     Verizon offered to provide wireless service to Plaintiff in exchange for Plaintiff's agreement to pay Verizon a fixed, monthly rate, which offer and acceptance created a binding contract between Plaintiff's and Verizon, respectively, based on good and valid, mutual consideration.  (*See* Exhibit A, a blank-form Verizon contract of the type believed to have been signed by Plaintiff and class members.)

59.     With respect to the wireless services for which the parties' contract allowed Verizon to charge Plaintiff, under the section entitled "SERVICE INFORMATION [. . .] PROMOTIONS," the following fields (subject to completion by Verizon) appear:  "Calling Plan Name & Code"; "Activation Fee"; "Promotions"; "Monthly Access"; and "Allowance Minutes Included."  Had Plaintiff contracted with Verizon to be charged for data service, such term would have appeared in one of these fields.

60.     But Plaintiff's contract with Verizon does *not* include anywhere in these fields or otherwise any term concerning Plaintiff's use of and Verizon's concomitant right to charge Plaintiff for data service, meaning the parties' contract did not allow Verizon to charge Plaintiff for data service unless Plaintiff affirmatively accessed and was objectively and technologically able to utilize such data service.

61.     In breach of the parties' contract and in the absence of any term allowing Verizon to charge Plaintiff for data service unless objectively and technologically utilized, Verizon has charged Plaintiff for data service even though, according to Verizon's records, Plaintiff's

17

individual data-usage episodes were under .50 KB, meaning such data service had no objective or technological benefit to him.

62.   As a direct and proximate result of Verizon's breach of Plaintiff's contract, which did not allow Verizon to charge Plaintiff for objectively or technologically useless data service, Plaintiff was injured by paying for data service even though, according to Verizon's records, Plaintiff's individual data-usage episodes were under .50 KB, meaning they had no objective or technological benefit to him.

## COUNT III
### Unjust Enrichment Under California Law

63.   Plaintiff repeats the allegation of the preceding paragraphs as if set forth at length herein.

64.   As the result of Verizon charging Plaintiff for data service that has no objective or technological benefit to the consumer, Plaintiff conferred a benefit upon Verizon, and Verizon received and retained this benefit under such circumstances that it would be inequitable and unconscionable to permit Verizon to retain this benefit without paying its reasonable value to Plaintiff.

65.   As a direct and proximate result of Verizon's unjust enrichment, Plaintiff and the class members suffered injury and seek an order directing Verizon to return to them the amount each of them improperly paid to Verizon, plus interest.

## PRAYER FOR RELIEF

Plaintiff requests the following relief:

A.   That this Court determine this action may be maintained as a class action

under Federal Rules 23(b)(2) and certify Plaintiff's proposed class;

B.  With respect to Count I, that this Court find Verizon violated the Federal Communications Act, 47 U.S.C. § 201, *et seq.*, as to Plaintiff and the class members; award damages appropriate to compensate Plaintiff and the class members and award costs and attorneys' fees;

C.  With respect to Count II, that this Court find Verizon breached its contracts with Plaintiff and the class members and award damages appropriate to compensate Plaintiff and the class members;

D.  With respect to Count III, that this Court determine Verizon was unjustly enriched by Plaintiff and the class members and that disgorgement on a collective basis is appropriate;

E.  That this Court enter an order awarding pre-judgment and post-judgment interest;

F.  That this Court enter an order awarding costs and attorneys' fees; and

G.  That this Court enter an order awarding all other relief as it may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all claims so triable.

Dated: October 13, 2010       **LITE DEPALMA GREENBERG, LLC**

By:   */s/Bruce D. Greenberg*
      Bruce D. Greenberg (bgreenberg@litedepalma.com)
      Jason E. Macias (jmacias@litedepalma.com)
      Two Gateway Center, Suite 1201
      Newark, NJ  07102
      Telephone:    (973) 623-3000
      Facsimile:    (973) 623-0858

      **GOLDMAN SCARLATO & KARON, P.C.**
      Daniel R. Karon
      700 W. St. Clair Avenue, Suite 204
      Cleveland, OH 44113
      Telephone:    (216) 622-1851
      Facsimile:    (216) 241-8175

Email: karon@gsk-law.com

**HEINS MILLS & OLSON, P.L.C**
Vincent J. Esades
310 Clifton Avenue
Minneapolis, MN 55403
Telephone:      (612) 338-4605
Facsimile:      (612) 338-4692
Email:          vesades@heinsmills.com

*Attorneys for Plaintiff and the putative class*

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

Plaintiff, by his attorneys, hereby certifies that to the best of his knowledge, the matter in controversy is related to <u>In re Verizon Wireless Data Charges Litigation</u>, Civil Action No. 10-1749, and MDL #2141, assigned to Hon. Freda L. Wolfson. Plaintiff is not currently aware of any other party who should be joined in this action.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment.


Dated:  October 13, 2010          **LITE DePALMA GREENBERG, LLC**


                          By:     */s/ Bruce D. Greenberg*
                                  Bruce D. Greenberg
                                  Two Gateway Center, Suite 1201
                                  Newark, New Jersey 07102
                                  Telephone: (973) 623-3000
                                  Facsimile: (973) 623-0858

# EXHIBIT A

UE7574
Made by WorkflowOne

## Customer Agreement Form
**verizon**wireless
www.verizonwireless.com

CSA0004TEN

### ACTIVATION INFORMATION

| Date | Account # | Credit Approval # | # of Phones /Lines | Activation Type: Please check one. |
|---|---|---|---|---|

☐ New  ☐ New w/CPE  ☐ Transfer of Service  ☐ Port In / New Account
☐ Upgrade  ☐ Renewal  ☐ Calling Plan w/Promo  ☐ Port In / Existing Account
☐ Add-on  ☐ Port In / Phone # Change

| Order # | Sales Rep Name / ID | Agent/Dealer/Sub Dealer ID | Store / Rep Phone Number |
|---|---|---|---|

| Group ID | Tie Code | iBAS MAC Code | BGSA | MEA | New Wireless # (MDA) | Existing Wireless # (MDA) |
|---|---|---|---|---|---|---|

### CONSUMER / BILLING INFORMATION / BUSINESS

| Party Financially Responsible for Account - Name (Please Print) | ☐ Corporation ☐ Proprietorship | ☐ Government ☐ Non-Profit | ☐ Partnership |
|---|---|---|---|

| E-mail Address (Note: By providing your e-mail address you consent to receive Verizon Wireless promotional opportunities.) Initials | Bill to Company Name/Responsible Party (Please Print) | Bill To MTN # |
|---|---|---|

Home Address*

Contact Name (Authorized Business Contact)

| City | State | ZIP Code | Ship to Address* / Shipping Charges $ _____ (if applicable) |
|---|---|---|---|

| Mailing Address (if different) | City | State | ZIP Code |
|---|---|---|---|

| City | State | ZIP Code | Business Phone ( ) | Years in Business | Federal Tax ID # |
|---|---|---|---|---|---|

| Home Phone ( ) | Work/Alternate Phone ( ) | Tax Exempt Certification # | D&B Number |
|---|---|---|---|

| Social Security # | Date of Birth | Bank Name | Bank Contact/Number |
|---|---|---|---|

| Primary ID # | State | Exp. Date | Commercial Account # | Years at Bank |
|---|---|---|---|---|

| Secondary ID# | Exp. Date | Company Headquarter's Address |
|---|---|---|

| The Sales Representative acknowledges that he/she has verified the customer's ID. Sales Rep Initials: | City | State | ZIP Code |
|---|---|---|---|

Employer / Employer Telephone #

*Place of Primary Use - _____ Yes _____ No   The home or business address indicated above is for the person using the phone and is the person's residential street or primary residence street address.

### PERSON USING PHONE (if different than above)

| User Name (Please Print) | Phone |
|---|---|

| Address | City | State | ZIP Code |
|---|---|---|---|

Place of Primary Use - The address above is the user's residential street or primary business street address. _____ Yes

### PORT REQUEST/OSP (Old Service Provider) INFORMATION

| Initials | Port In Number | OSP account # | Password / PIN | Billing Address / Name w/OSP (If different from above) |
|---|---|---|---|---|
| | Type of Number (i.e., Landline or Wireless) | OSP name | | |

### SERVICE INFORMATION / PROMOTIONS

| Calling Plan Name & Code | Activation Fee $ | Promotion(s): ☐ Check here for NO PROMOTION |
|---|---|---|

| Monthly Access $_____ / Month | Allowance Minutes Included: _____ / Month | Initials | I understand that I am receiving the first _____ month(s) of _____ at no charge. After this period, I will be charged $_____ per month. I understand that I can cancel this feature at anytime by calling *611 on my wireless phone. ☐ Check here if NOT APPLICABLE |
|---|---|---|---|

### ENHANCED FEATURES – All costs are monthly. (May not be available in all areas.)

| $ | ☐ Enhanced Voice Mail | $ | ☐ Select ☐ Decline Total Equipment Coverage** | $ | ☐ Voice Mail |
|---|---|---|---|---|---|
| $ | ☐ Detailed Billing | $ | ☐ Select ☐ Decline Extended Warranty | $ | ☐ Call Waiting |
| $ | ☐ Mobile to Mobile | $ | ☐ Select ☐ Decline Wireless Phone Protection* | $ | ☐ Call Forwarding |
| $ | ☐ TXT Messaging | $ | ☐ Other | $ | ☐ 3 Way Calling |
| $ | ☐ Mobile Web | $ | ☐ Other | $ | ☐ Caller ID |

Initials   I _____ select or _____ decline Wireless Phone Protection* and understand if I decline, I am responsible for replacement equipment at a non-discounted price.
* Provided by third-party insurer.

### EQUIPMENT / PAYMENT INFORMATION

| Price $ | Non-Discounted Price $ | ESN / MEID | Model | Lock Code | ☐ MIN (Check if ported) |
|---|---|---|---|---|---|

| SKU#/Prod ID | Equipment | $ | Other | $ |
|---|---|---|---|---|
| SKU#/Prod ID | Accessory #1 | $ | Trade-in/Rebate/Discount | $ |
| SKU#/Prod ID | Accessory #2 | $ | Sub-total | $ |
| SKU#/Prod ID | Accessory #3 | $ | Sales Tax | $ |

| Paid By: ☐ Check/Money Order# ☐ Credit Card P.O. # ☐ Cash ☐ Other | Programming Fee | $ | | |
|---|---|---|---|---|
| | Security Deposit Amount | $ | Total Due | $ |

| Credit Card # | Exp. Date | Name as it appears on Credit Card | Credit Card/Check Approval # |
|---|---|---|---|

### TERM / FINANCIAL RESPONSIBILITY & CUSTOMER ACCEPTANCE

| Initials | ☐ One (1) Year ☐ Two (2) Year ☐ Other Effective Date ____ | Initials | I am personally responsible for payment of all charges associated with this account (OR) I am signing on behalf of the Company listed above as Responsible Party and I am duly authorized to financially commit the company. If I am not authorized, I will pay the charges if the Company named denies responsibility. |
|---|---|---|---|

I AGREE TO THE CURRENT VERIZON WIRELESS CUSTOMER AGREEMENT (CA), INCLUDING THE CALLING PLAN, (WITH EXTENDED LIMITED WARRANTY/SERVICE CONTRACT, IF APPLICABLE), AND OTHER TERMS AND CONDITIONS FOR SERVICES AND SELECTED FEATURES I HAVE AGREED TO PURCHASE AS REFLECTED IN THIS FORM, AND WHICH HAVE BEEN PRESENTED TO ME BY THE SALES REPRESENTATIVE, AND WHICH I HAD THE OPPORTUNITY TO REVIEW. I UNDERSTAND THAT I AM AGREEING TO AN EARLY TERMINATION FEE OF UP TO $175 PER LINE, LIMITATIONS OF LIABILITY FOR SERVICE AND EQUIPMENT, SETTLEMENT OF DISPUTES BY ARBITRATION AND OTHER MEANS INSTEAD OF JURY TRIALS AND OTHER IMPORTANT TERMS IN THE CA.